UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | 1:25-cr-00087-JMS-MKK |
| *vs.* | ) | |
| | ) | |
| NYDARIAN JORDAN, | ) | (01) |
| | ) | |
| *Defendant.* | ) | |

## ORDER

Defendant Nydarian Jordan has been charged with one count of Possession with Intent to Distribute 500 Grams or More of a Mixture or Substance Containing a Detectable Amount of Methamphetamine, in violation of 21 U.S.C. § 841(a)(1); one count of Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c); and one count of Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1). [Filing No. 14.] His charges stem from a traffic stop on March 8, 2025 in Hamilton County, Indiana. [*See* Filing No. 1.] Mr. Jordan has filed a Motion to Suppress in which he seeks the suppression of all physical or testimonial evidence resulting from the traffic stop. [Filing No. 40.] The Court held a hearing on the Motion to Suppress on May 6, 2026, and the Motion is now ripe for the Court's review.

## I.
### FINDINGS OF FACT

The following are the Court's factual findings from the evidence submitted with the parties' briefs and presented at the May 6, 2026 hearing. In making these findings of fact, the Court has considered the testimony and demeanor of Fishers Police Department ("FPD") Officer Levi App,

who testified at the May 6, 2026 hearing, and Officer App's dashboard camera and body-worn camera videos from the March 8, 2025 traffic stop.[1]

### A.    Officer App's Training

Officer App has been employed by the FPD for three years and prior to that he was a town marshal in Cloverdale, Indiana for four years and a sheriff's deputy in Morgan County, Indiana for two and a half years.  He graduated from the Indiana Law Enforcement Academy and has completed continuing education through Interdiction Mastermind Training and Street Smart Cop. He has also taken advanced courses in interrogation and interview skills, with a focus on recognizing criminal indicators, and worked with the Drug Enforcement Agency Task Force when he was stationed in Morgan County, Indiana.  He has been a K9 handler for several agencies, where he conducted multiple investigations related to possession and distribution of narcotics.

During his time as a law enforcement officer, Officer App has been involved in over 200 investigations of potential drug trafficking.  When working in Cloverdale and Morgan County, he was stationed in a high volume narcotics area near Interstate 70 and his investigations involved stopping vehicles before ultimately observing indicators of drug trafficking, however not all of his investigations resulted in a determination that drug trafficking had occurred.

---

[1] The Court cites to Officer App's dashboard camera video by time stamp as "Dash Cam" and his body-worn camera video by time stamp as "Body Cam."  The Court only provides the time-stamp citations for factual findings that are particularly relevant to the issues raised in the Motion to Suppress.

**B.**     **Officer App Initiates the March 8, 2025 Traffic Stop**

On March 8, 2025,[2] Officer App was conducting patrol along Interstate 69 in Fishers, Indiana around 7:00 a.m.  He was sitting stationary in his patrol car in the median facing west around mile marker 212 watching southbound traffic for traffic infractions when he observed a white Kia Forte, which was driven by Mr. Jordan, with "heavy dipping in the front end" traveling in the far left lane.  The "heavy dipping" indicated to Officer App that the driver was rapidly decreasing his speed and depressing his brakes.  Officer App utilized his hand-held radar, which reflected that the vehicle was traveling at approximately 58 miles per hour in a 70-mile-per-hour zone.  When the vehicle passed him, Officer App also noticed a tinted license plate cover which made the license plate number unreadable to him.

Officer App then pulled out from his stationary location in the median and began attempting to catch up to the vehicle.  He did not turn his lights on right away.  At around the 205 or 206 mile marker, Officer App began catching up to the vehicle and then observed it still in the far left lane and drifting over the dashed white line on the right hand side and also over the solid yellow line on the left hand side.  [Dash Cam at 00:27-00:47.]  Mr. Jordan used his signal to move one lane to the right and Officer App subsequently initiated his lights to make a traffic stop.  He initiated the stop based on the vehicle traveling 58 miles per hour in the far left lane in a 70-mile-per-hour zone, the obstructed license plate, and unsafe lane movement.

---

[2] Some of the Government's briefs and exhibits refer to the traffic stop as taking place on March 8, 2024, and counsel for the Government initially referred to March 8, 2024 at the May 6, 2026 hearing.  When questioned by the Court, however, counsel for the Government clarified that the traffic stop in fact took place on March 8, 2025.  The Court considers all references to the traffic stop occurring on March 8, 2024 to be typographical errors, as the parties are in agreement that the traffic stop took place on March 8, 2025. Government's counsel is encouraged to pay closer attention to detail in the future.

### C.     Officer App's Interactions With Mr. Jordan

Mr. Jordan used his turn signal to switch lanes and immediately pulled over on the shoulder of Interstate 69.  Officer App radioed in the vehicle's license plate number as he was pulling over and when he was approximately 5 to 15 feet behind Mr. Jordan's vehicle, right before he exited his patrol car to make contact with Mr. Jordan.  [Body Cam at 00:55-01:00.]  Officer App approached Mr. Jordan's vehicle from the passenger side, looked into the passenger side window (which Mr. Jordan had opened), and observed a large amount of United States currency under a bag, later determined to be $552, scattered on the front passenger seat.  He also observed two cell phones. Mr. Jordan was the only occupant of the vehicle, and Officer App observed that he appeared to be nervous and his hands were trembling.  Officer App informed Mr. Jordan that he had pulled him over because of his license plate cover and stated that he could not see the license plate at all. Officer App asked for the vehicle's registration, Mr. Jordan looked through several documents in the vehicle's glove box and gave Officer App the vehicle registration and his driver's license, Officer App asked if he had any recent tickets to which Mr. Jordan responded "no," and Officer App told him to "hang tight" and that he would be right back.

Officer App then returned to his patrol car, appeared to look up information on his laptop computer, asked whether "county or anybody" was nearby with a K9 officer, and requested backup stating "can I get a couple units over here.  This guy's gonna have a lot, I'm dealing with methamphetamine, SVF,[3] and a large amount of currency on the passenger seat."  [Body Cam at

---

[3] The Court understands "SVF" to mean a prior conviction for Possession of a Firearm by a Serious Violent Felon.

02:48-04:30.][4] Officer App requested backup because he had conducted a query in the Indiana MyCase system and learned that Mr. Jordan had prior convictions for being a serious violent felon, possession of narcotics and machine guns, and dealing drugs. Officer App continued to type information into his laptop and approximately four minutes later he spoke to another officer who had arrived on the scene, they discussed getting Mr. Jordan out of his vehicle, and Officer App stated "he's got quite a bit of currency in the front passenger seat and he has two phones. That's enough for me to get a dog." [Body Cam at 07:10-07:20.]

Officer App then exited his patrol car again, approached the driver's side of Mr. Jordan's vehicle, and asked Mr. Jordan if he had an insurance card for the vehicle. He had been instructed to ask for proof of insurance during his training as a law enforcement officer in Indiana and it was his usual practice as an FPD officer to do so. Even so, he did not ask Mr. Jordan for the proof of insurance at their initial encounter. In response to the request for insurance, Mr. Jordan said that he did not have insurance information and that the vehicle was not his but that he would contact his cousin for the insurance information. Officer App asked him to step out of the vehicle and Mr. Jordan questioned why he needed to exit the vehicle, but eventually did so. Officer App patted Mr. Jordan down to check for weapons and discovered wads of cash, later determined to total $10,100, tucked into Mr. Jordan's waistband. [Body Cam at 08:40-08:59; Filing No. 1 at 4.] Officer App asked Mr. Jordan why he had so much cash on him, and Mr. Jordan said that he had just come from gambling. [Body Cam at 08:42-08:49.]

---

[4] Unfortunately, Officer App continued to play music on his patrol car radio for part of the traffic stop, so it is difficult at times to hear what he is saying to the dispatcher. A policy requiring officers to turn off their patrol car radios once a stop is initiated would make dashboard and body-worn camera footage more useful.

For the next approximately two minutes, Officer App continued to ask Mr. Jordan for proof of insurance and Mr. Jordan attempted to call his cousin, the owner of the vehicle. Officer App then returned to his patrol car and radioed to ask for the estimated time of arrival of the K9 officer. [Body Cam at 10:35-10:45.] He remained in his patrol car for approximately five minutes writing out a warning ticket for the obstructed license plate while other officers stood with Mr. Jordan on the side of the highway. [Body Cam at 10:38-15:34.] He was waiting for the K9 officer to arrive and was using the insurance request as a reason to keep Mr. Jordan at the scene. The K9 officer arrived and shortly thereafter Officer App exited his patrol car, gave Mr. Jordan the warning ticket, and asked if his cousin was able to provide him with the insurance information.

**D.      The K9 Search and Mr. Jordan's Arrest**

Meanwhile, the K9 officer had arrived and alerted to the presence of controlled substances in Mr. Jordan's vehicle, and Mr. Jordan was subsequently handcuffed and advised of his rights. [Body Cam at 16:25-16:45.] Mr. Jordan's vehicle was searched and approximately 732 grams of methamphetamine was discovered in a black zippered case under the hood, on top of the vehicle's battery. [Filing No. 1 at 4-5.] The traffic stop lasted a total of approximately 27 minutes.

Mr. Jordan was ultimately charged with one count of Possession with Intent to Distribute 500 Grams or More of a Mixture or Substance Containing a Detectable Amount of Methamphetamine, in violation of 21 U.S.C. § 841(a)(1); one count of Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c); and one count of Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1). [Filing No. 14.] Subsequently, he filed his Motion to Suppress in which he seeks the suppression of all of the physical or testimonial evidence obtained during the March 8, 2025 traffic stop.

## II.
### DISCUSSION

Mr. Jordan argues in support of his Motion to Suppress that the initial traffic stop was not justified and that, even if it was, Officer App illegally drew out the traffic stop to wait for the K9 officer to arrive, without reasonable suspicion that drug trafficking was occurring. The Court considers each argument in turn.

### A.    The Initial Traffic Stop

In support of his Motion to Suppress, Mr. Jordan argues that the traffic stop was not justified because he had not committed any traffic infractions. [Filing No. 41 at 3.] Specifically, he asserts that traveling 58 miles per hour in a 70 mile-per-hour zone is not a traffic infraction, that Officer App was able to call in his license plate number so the plate could not have been obstructed, and that he did not change lanes without signaling. [Filing No. 41 at 3.]

In its response, the Government argues that the traffic stop was justified because Mr. Jordan committed multiple traffic violations, including that his license plate cover violated Ind. Code § 9-18.1-4-4(b)(3) because it "rendered the license plate unreadable by Officer App when Officer App was in the median area of Mile Marker 212 of Interstate 69 South," that it was unreadable when Officer App pulled out of the median area to try to catch up to Mr. Jordan's vehicle, and that "it was not until Officer App was stopped behind the vehicle that he could see the plate well enough to read it." [Filing No. 48 at 8-9.] The Government contends that Mr. Jordan was also violating Ind. Code § 9-21-5-9 by traveling 58 miles per hour in the far left lane when the speed limit was 70 miles per hour, and was violating Ind. Code § 9-21-8-11.5 when "his vehicle drifted into the middle lane of Interstate 69 without signaling, before drifting back into the far-left lane." [Filing No. 48 at 10.]

Mr. Jordan argues in his reply that the Court should not "accept Officer App's justification for the stop," and that video evidence shows that Mr. Jordan was not speeding, that Officer App called in Mr. Jordan's license plate while Officer App was "still moving towards the traffic stop," and that there was no unsafe lane movement.  [Filing No. 49 at 2-3.]

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "Under the Fourth Amendment, a police officer may lawfully stop a car when the officer has reasonable suspicion that the car is involved in a traffic offense."  *United States v. Phillips*, 2024 WL 3842092, at *2 (7th Cir. Aug. 16, 2024) (citing *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)).  An officer only needs "reasonable suspicion that [the defendant] committed a traffic offense to pull him over."  *Phillips*, 2024 WL 3842092, at *2 (citing *Rodriguez*, 575 U.S. at 354; *Navarette v. California*, 572 U.S. 393, 396-97 (2014)).  "Further, the reasonable belief that a driver committed even a minor traffic infraction will support a stop [and] the officer's subjective reason for stopping the car (i.e., suspicion of drug dealing) does not undermine the validity of the stop so long as the facts known to officers before stopping the car objectively support the stop."  *Phillips*, 2024 WL 3842092, at *2 (citations omitted).

"The Fourth Amendment requires searches and seizures to be reasonable; it does not demand that police and other public officials resolve all possible exceptions before approaching a stopped car and asking the first question."  *United States v. Johnson*, 874 F.3d 571, 573 (7th Cir. 2017).  "Whether the driver actually committed a traffic infraction is irrelevant for Fourth Amendment purposes so long as there was an objective basis for a reasonable belief he did."  *United States v. Lewis*, 920 F.3d 483, 489 (7th Cir. 2019) (citation omitted).  Officer App testified that he initiated the March 8, 2025 traffic stop because Mr. Jordan had committed three traffic

infractions – traveling 58 miles per hour in the far left lane in a 70 mile-per-hour zone, drifting out of his lane without signaling, and having an obstructed license plate. When Officer App initially approached Mr. Jordan's vehicle at the beginning of the traffic stop he told Mr. Jordan that he had been pulled over for having an obstructed license plate, so the Court discusses that infraction first.

Indiana Code § 9-18.1-4-4 provides:

(b) A license plate shall be:

\*              \*              \*

(3) not obstructed or obscured by…accessories, or other opaque objects.

\*              \*              \*

(f) A person that violates this section commits a Class C infraction.

The Dash Cam and Body Cam video establishes that the license plate on Mr. Jordan's vehicle was obscured by a tinted cover. While Officer App was eventually able to radio the license plate number to the FPD dispatcher, this did not occur until Officer App was five to fifteen feet behind Mr. Jordan's vehicle, as he was pulling up behind it on the shoulder of Interstate 69. Based on its review of the Dash Cam and Body Cam video evidence, the Court finds that the license plate on Mr. Jordan's vehicle was obscured by a tinted cover and that Officer App had a reasonable suspicion that Mr. Jordan was violating Ind. Code § 9-18.1-4-4(b)(3).[5] Accordingly, the Court finds that Officer App's act of pulling over Mr. Jordan was constitutional. *See United States v. Simon*, 937 F.3d 820, 829 (7th Cir. 2019) ("If an officer reasonably thinks he sees a driver commit a traffic infraction, that is a sufficient basis to pull him over without violating the Constitution.").

---

[5] Based on this finding, and Officer App's stated reliance on it at the time of the stop, the Court does not further consider whether Officer App had a reasonable suspicion that Mr. Jordan had violated Ind. Code § 9-21-5-9 by traveling 58 miles per hour in the far left lane in a 70 mile-per-hour zone, or had violated Ind. Code § 9-21-8-11.5 by drifting over the white dashed line on the right and the solid yellow line on the left when traveling in the far left lane of Interstate 69.

### B.    The K9 Search

Mr. Jordan argues in support of his Motion to Suppress that even assuming the traffic stop was justified, "the stop cannot be prolonged for law enforcement to develop probable cause to search a vehicle." [Filing No. 41 at 3.]  He contends that "it is apparent that the officer was prolonging the traffic stop to stall until the canine officer could arrive on [the] scene.  He begins the stop with a request for the location of a canine officer.  He continues to ask for the arrival time for a canine officer.  He then extends the traffic stop by inquiring about insurance to hold the defendant until the canine officer arrives." [Filing No. 41 at 4.]

The Government argues in its response that Officer App "had reasonable suspicion that criminal activity was afoot," and that Mr. Jordan "was involved in narcotics trafficking." [Filing No. 48 at 11.]  It argues that Officer App was justified in delaying the traffic stop for the K9 officer to arrive because he observed "the front end of the white Kia Forte sink downward rapidly, indicating to [him] that the driver of the vehicle had quickly depressed the [brakes] upon noticing Officer App"; Mr. Jordan was "noticeably nervous" during the traffic stop; Mr. Jordan had multiple cell phones in his lap and $552 in loose United States currency sitting on the passenger seat; Mr. Jordan was resistant and became even more nervous when Officer App asked him to step out of the vehicle; and Officer App found "an extremely large amount of United States currency" stuffed into Mr. Jordan's waistband when he patted Mr. Jordan down. [Filing No. 48 at 11-12.]  It notes that Officer App "has had extensive training and experience in investigating drug trafficking cases," and "is familiar with behaviors indicative of narcotics trafficking…and with tactics commonly employed by narcotics traffickers." [Filing No. 48 at 13.]

In his reply, Mr. Jordan argues that Officer App requested a K9 before he established contact with Mr. Jordan, even though Mr. Jordan had no warrants and a valid drivers' license.

[Filing No. 49 at 3.]  He notes that Officer App did not issue a ticket or a warning, but instead raised the issue of insurance which "was simply to prolong the traffic stop so as to give the K9 time to arrive on scene."  [Filing No. 49 at 3.]  He asserts that Officer App's "observations were only made after Officer App had illegally prolonged the traffic stop in an attempt to develop probable cause for the continued detention of [Mr. Jordan]."  [Filing No. 49 at 3.]  Mr. Jordan also argues that the fact that data reflecting drug trafficking was retrieved from one of the seized cell phones several days later "cannot justify law enforcement's actions on March 8, 2025."  [Filing No. 49 at 3.]

"A constitutionally reasonable traffic stop may last no longer than what is necessary for officers to complete their 'mission.'"  *United States v. Devalois*, 128 F.4th 894, 898 (7th Cir. 2025) (quoting *Rodriguez*, 575 U.S. at 354).  The Seventh Circuit Court of Appeals recently explained the scope of an officer's "mission" during a traffic stop:

> Broadly speaking, the mission of a traffic stop involves address[ing] the traffic violation that warranted the stop and attend[ing] to related safety concerns.  Police may check the driver's license, seek the vehicle's registration, request proof of insurance, and investigate whether there are warrants out for the driver's arrest.  An officer may also ask the driver questions pertinent to the stop, including questions related to travel plans.

> Beyond this mission, police are free to engage in certain additional activities as long as they do not prolong the traffic stop.  An officer may, for instance, ask questions that have nothing to do with either the traffic violation or safety matters.  And, particularly relevant here, policy may even conduct a dog sniff.

*Devalois*, 128 F.4th at 898-99 (quotations and citations omitted).

The Seventh Circuit has "repeatedly declined to adopt even a rule of thumb as to how long a reasonable stop may last."  *Id.* at 899 (finding that six-minute time frame between officer's first contact with driver and K9's alert did not unreasonably prolong stop where officer "diligently pursued tasks that fell within the stop's mission" of issuing a warning for following too closely

behind a semi-truck, including seeking driver's license, checking license status, running search for vehicle, seeking registration card, and drafting warning) (quotation and citation omitted). "[A] stop is not unreasonably prolonged until after the officers have, or reasonably should have, completed the tasks related to the traffic stop. Of course, if the officers develop reasonable suspicion of another crime, they don't have to turn a blind eye to that potential crime." *United States v. Avila*, 106 F.4th 684, 696 (7th Cir. 2024) (citations omitted).

Reasonable suspicion that other illegal activity is occurring exists when "considering the totality of the circumstances, an officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cole*, 21 F.4th 421, 433 (7th Cir. 2021) (quotation and citation omitted). While "[a] hunch is not enough," *id.*, the "level of suspicion [needed] is considerably less than proof of wrongdoing by a preponderance of the evidence," *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "[T]he ultimate touchstone of the Fourth Amendment is reasonableness," *Lange v. California*, 594 U.S. 295, 301 (2021) (quotation and citation omitted), and "[r]easonableness, in turn, is measured in objective terms by examining the totality of the circumstances," *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). Law enforcement officers may "lean upon their experience and specialized training to draw inferences from and deductions about available cumulative information" when determining whether they are suspicious that criminal activity is occurring. *United States v. Olson*, 41 F.4th 792, 800 (7th Cir. 2022).

The Dash Cam and Body Cam video reflect that Officer App requested a K9 officer and back-up units after observing the two cell phones and the cash scattered on the front passenger seat of Mr. Jordan's vehicle under a bag.[6] When requesting backup, Officer App also mentioned to the

---

[6] Although Mr. Jordan argues that Officer App called for a K9 officer before interacting with Mr. Jordan, he does not provide a citation to the Dash Cam or Body Cam video to support his argument and the Court finds that the videos do not reflect that sequence of events.

dispatcher Mr. Jordan's prior convictions for being a serious violent felon, possession of narcotics and machine guns, and dealing drugs, which he had learned of when he performed a search on Indiana MyCase.  When another officer arrived on the scene, Officer App told him "he's got quite a bit of currency in the front passenger seat and he has two phones.  That's enough for me to get a dog."  [Body Cam at 07:10-07:20.][7]

If Officer App had a reasonable suspicion that Mr. Jordan was engaged in illegal drug activity, then he was justified in prolonging the traffic stop until the K9 officer arrived.  *See Avila, 106 F.4th at 696* (if officer develops a reasonable suspicion that another crime is occurring during traffic stop, he may prolong stop to investigate the additional crime).  When Officer App requested the K9 officer, he knew the following information: (1) Mr. Jordan had prior convictions for being a serious violent felon, possession of narcotics and machine guns, and dealing drugs[8]; (2) Mr. Jordan appeared nervous; (3) Mr. Jordan had two cell phones; and (4) there was a large amount of

---

[7] The Court notes the Seventh Circuit's instruction that "[t]ypically, the ordinary inquiries incident to a traffic stop involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Cole*, 21 F.4th at 428 (quotation and citation omitted); *see also Devalois*, 128 F.4th at 898-99. Although the K9 officer arrived before the insurance issue had been resolved (since Mr. Jordan had to contact his cousin for the information), the Court finds it significant that Officer App did not ask for insurance information when he first approached Mr. Jordan's vehicle and, instead, only asked for it after developing a suspicion that Mr. Jordan was engaged in drug trafficking.  Based on the sequence of events, the Court declines to find that Officer App's request for insurance information was part of the "mission" of the traffic stop.  And in any event, the Government does not request such a finding.

[8] While the Government primarily argues – and Officer App primarily testified – that Officer App's reasonable suspicion was based on Mr. Jordan's possession of two cell phones and the presence of a large amount of cash on the front passenger seat, Officer App also testified that he was aware of Mr. Jordan's prior criminal convictions when he called for backup in addition to a K9 officer, and he mentioned that information to the dispatcher.  [*See also* Body Cam at 03:13-03:30.]

cash scattered on the front passenger seat of Mr. Jordan's vehicle under a bag.[9]  While each of these circumstances alone may not support reasonable suspicion,[10] the Court considers their totality and finds that when combined, Officer App had a reasonable suspicion that Mr. Jordan was engaged in illegal drug activity.  *See Lewis*, 920 F.3d at 493 (nervousness and a criminal history which included being on supervised release for a drug offense, combined with inconsistent travel explanation, constituted reasonable suspicion of illegal activity); *United States v. Park*, 2016 WL 74665, at *5-6 (S.D. Ill. Jan. 7, 2016) (fact that vehicle had out-of-state license plate from well-known drug interdiction area, driver was carrying multiple cell phones, vehicle was a rental, travel plan information was inconsistent, and driver was very nervous supported reasonable suspicion that illegal activity was occurring); *United States v. Lopez*, 553 Fed. Appx. 10, 12 (2d Cir. 2014) (driver appeared nervous, had two cell phones, had an air freshener in his vehicle, and had difficulty answering questions about travel plans which, taken together, were sufficient to give officer "reasonable suspicion that criminal activity was afoot"); *U.S. v. Guerrero-Sanchez*, 412 Fed. Appx. 133, 139-40 (10th Cir. 2011) ("While possession of two cell phones and nervousness demonstrated by shaking hands or a twitching jaw might, by themselves, constitute innocent

---

[9] In arguing that there was a reasonable suspicion that Mr. Jordan was engaged in illegal drug activity, the Government also relies on the fact that Officer App observed that the front end of Mr. Jordan's vehicle sank down rapidly when Mr. Jordan noticed Officer App's patrol car, suggesting that he "quickly depressed the [brakes]."  [Filing No. 48 at 11-12.]  The Court does not find this circumstance significant to the reasonable suspicion issue, as it is likely that most people depress their brakes upon seeing a police officer monitoring speed on a highway, even when they are not engaged in illegal activity.

[10] For example, having two cell phones, but itself, would not be enough to support reasonable suspicion.  Indeed, Officer App testified that he regularly carries two cell phones and the Court recognizes that many other individuals who are not engaged in illegal drug activity regularly carry both a work and personal cell phone.  Additionally, appearing nervous during a traffic stop, by itself, does not necessarily indicate that an individual is engaged in something nefarious.  Nervousness in response to a traffic stop is a common occurrence even by law-abiding citizens.

conduct, the totality of the circumstances, together with [the officer's] training and expertise, led to an objectively reasonable and articulable suspicion of illegal conduct for the purpose of detaining [defendant], pending further investigation, and did not violate the Fourth Amendment."); *United States v. Whitney*, 391 Fed. Appx. 277, 282 (4th Cir. 2010) (officer had reasonable suspicion to believe illegal drug activity was occurring where driver appeared to be very nervous and was carrying a large amount of cash in his pockets).[11]

Because Officer App had a reasonable suspicion that Mr. Jordan was engaged in illegal drug activity based on his criminal history, his nervous demeanor, the fact that he had two cell phones, and the large amount of cash scattered on the front passenger seat underneath a bag, Officer App did not violate Mr. Jordan's Fourth Amendment rights by extending the traffic stop until the K9 officer arrived and conducted its open-air sniff of Mr. Jordan's vehicle. Based on this

---

[11] The Court ordered the parties to provide a list of cases supporting their respective positions relating to whether Officer App had reasonable suspicion to prolong the traffic stop. The cases Mr. Jordan provided involved circumstances distinguishable from the circumstances in this case. *See, e.g., United States v. Rodriguez-Escalera*, 884 F.3d 661, 669-71 (7th Cir. 2018) (granting motion to suppress where video evidence did not reflect that driver and passenger were nervous, travel plan information was not necessarily contradictory, and air fresheners in car were not "'excessive' to the point of suggesting unlawful activity"); *United States v. Townsend*, 305 F.3d 537, 542-45 (6th Cir. 2002) (granting motion to suppress where driver's immediate raising of hands in the air and being unusually cooperative were not suspicious, information regarding travel plans was not inherently suspicious, traveling from Chicago to Columbus was not suspicious, presence of three cell phones in the absence of other "more substantially suspicious factors" was "weak," presence of Bible in vehicle did not indicate criminal activity, evidence did not reflect the amount of cash defendants were carrying, prior conviction on weapons charge justified search for weapons but did not provide reasonable suspicion of "more extensive criminal activity," officers' account that defendants were nervous was not credible, unkempt condition of vehicle was not suspicious, and fact that driver's mother owned car was not suspicious); *United States v. Montero-Camargo*, 208 F.3d 1122, 1132-40 (9th Cir. 2000) (driver's Hispanic appearance and fact that he would not make eye contact with officer during traffic stop did not justify border patrol officer's stop or search of vehicle, but driver's U-turn on a highway at a place where border officials' view was obstructed, driving in tandem with another vehicle, having Mexicali license plate, and subsequent stop at a location historically used for illegal activities was sufficient to justify stop and search).

finding and the finding that the initial traffic stop was constitutional, the Court **DENIES** Mr. Jordan's Motion to Suppress.  [Filing No. 40.]

## III.
### CONCLUSION

For the foregoing reasons, Mr. Jordan's Motion to Suppress, [40], is **DENIED**.

Date: 5/28/2026

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

- 16 -